JAY CLAYTON
United States Attorney for the
Southern District of New York
By:    Timothy Capozzi
       Juliana Murray
       Assistant United States Attorneys
       26 Federal Plaza
       New York, New York 10278
       (212) 637-2404/2314

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                                    :

                -v.-                                    :

ANY AND ALL CRYPTOCURRENCY                                  :
FORMERLY ASSOCIATED WITH THE EXODUS
WALLET ADDRESS                                              :
3PjqKPuquQXaCQEcSTrGlhaMuCwtDNry99,
THAT WAS SEIZED BY THE GOVERNMENT                           :
ON OR ABOUT NOVEMBER 19, 2020 DURING THE
SEARCH OF AN APARTMENT LOCATED AT 205                       :
WEST ROSS AVE., EL CENTRO, CALIFORNIA 92243

                Defendant-in-rem.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**VERIFIED COMPLAINT**
**FOR FORFEITURE**

26 Civ. 4368

Plaintiff United States of America, by its attorney, Jay Clayton, United States

Attorney for the Southern District of New York, for its verified civil complaint, alleges, upon

information and belief, as follows:

## I.  JURISDICTION AND VENUE

1.    This action is brought pursuant to Title 18, United States Code, Section

981(a)(1)(C), and 984 by the United States of America seeking the forfeiture of the following:

        a.    Any and all cryptocurrency formerly associated with the Exodus
wallet address 3pjqkpuquqxacqecstrglhamucwtdnry99 that was
seized by the Government on or about November 19, 2020 during
the search of an apartment located at 205 West Ross Ave., El Centro,

California 92243

(the "Defendant-*in-rem*").

2.      This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Sections 1345 and 1355.

3.      Venue is proper pursuant to Title 28, United States Code, Section 1355(b)(1)(A) because the acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

4.      As set forth below, there is probable cause to believe that the Defendant-*in-rem* is subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) as constituting or derived from proceeds traceable to the commission of violations of Title 18, United States Code, Section 1343 (wire fraud) and pursuant to Title 18, United States Code, Section 981(a)(1)(A), as property involved in money laundering, in violation of Title 18, United States Code, Section 1956.

## II.  BASIS FOR FORFEITURE

5.      This action arises out of an investigation conducted by law enforcement authorities (the "Investigation") which involved a social engineering and vishing[1] campaign that was directed at a large number and variety of organizations and entities (the "Scheme"). The Investigation included the targeting of individuals who work at various companies, including financial industry and services companies and technology companies. The Scheme appears to be designed in part to procure and compromise the credentials (usernames and passwords) of

---

[1] Vishing is a form of criminal phone fraud, using social engineering over the telephone system to gain access to private personal and financial information for the purpose of financial gain.

2

individuals who work at these companies, including through spearphishing emails and vishing calls to the work email accounts and phone numbers of the victims targeted.

6. During a vishing attack, a telephone call is made to a victim that seeks to induce the target to take an action that will allow the attacker to obtain unauthorized access to the targeted victim's account or system. This can be accomplished in a number of ways, including by tricking the victim to unwittingly provide account credentials (username and password) or other personal information to allow the attacker to remotely login to and obtain unauthorized access to online accounts or systems. Oftentimes the attackers will conduct research on their victims (including the victims' interests, the types of online services to which they subscribe, or the individuals with whom the victims frequently communicate) in order to trick the victims. Social engineering techniques include the use of deception to manipulate individuals into divulging confidential or personal information, which the attackers can then use to take over accounts by making various misrepresentations, including impersonating accountholders and indicating a purported need to regain access to their accounts. Using vished credentials, the attackers can then mine the victim company databases for customers' personal information, which the attackers can then leverage in other cyber-attacks, with the goal of improperly obtaining currency (including digital currency, such as Bitcoin).

## CRYPTOCURRENCY BACKGROUND

7. A cryptocurrency is a decentralized virtual currency, exchangeable against fiat currency via online platforms that serve as exchangers. Many cryptocurrency transactions are peer-to-peer. Cryptocurrencies are maintained in virtual "wallets" containing "addresses," which are represented by a unique series of alpha-numeric characters. All cryptocurrency transactions, both incoming and outgoing, are recorded in a

3

publicly-available ledger called a "blockchain," which records every address that has ever transferred or received a unit of a given cryptocurrency. Arbitrum and Ethereum are two examples of a blockchain. An "Arbitrum address" can hold multiple cryptocurrencies that are compatible with the Ethereum blockchain.

8.    Blockchains, like the Arbitrum and Ethereum blockchain, serve as vast open ledgers for any individual to examine. Thus, all transactions are completely transparent in that any transfer can be verified or monitored on the publicly-available blockchain. However, in most blockchains, the senders and receivers are largely anonymous. The sender and receiver in a given transaction are each represented by their cryptocurrency address, an alpha-numeric string analogous to a traditional bank account number.

9.    Cryptocurrencies can be stored both online and offline. They can be stored in accounts operated by a host of various providers and accessed via any device capable of connecting to the internet. However, this access to the internet also means that such online accounts are more vulnerable to thefts. Thus, cryptocurrency can also be stored in "cold storage," which refers to the offline holding of the funds. Cold storage methods include, for example, a USB drive, a specialized hardware wallet (which typically resemble a handheld USB drive) or even on a piece of paper.

**THE SCHEME**

10.    The Scheme included, among other activities, contacting victims by phone call, email, or chat application, registering web domains purporting to belong to various companies, and attempting to direct company employees to log into the false web domains with the employees' credentials.

11.     The Investigation has identified more than 100 false web domains that law enforcement believes the Scheme participants created in furtherance of the social engineering and vishing scheme.

12.     Further, the Investigation revealed that a particular telecommunications company ("Company-1") was the target of the Scheme after the following occurred:

a.     On or about August 29, 2020, an individual involved in the Scheme (the "Subject") exploited a loophole in an internal Company-1 website, which enabled the Subject to add a particular electronic device ("Device-1") controlled by the Subject to the list of authorized devices contained in the user profile of a particular Company-1 employee ("Employee-1") whose credentials had been compromised earlier that month.

b.     Once Device-1 was added to the list of authorized devices on Employee-1's profile, the Subject was temporarily able to use Device-1 to interface directly with Company-1's corporate network without any further authentication.

c.     After becoming aware of the breach in its security protocols, Company-1 was able to obtain metadata associated with Device-1, including a device name, model, product code, serial number, and unique identification code assigned by the manufacturer of the device.

d.     Company-1 blocked Device-1's ability to connect directly with Company-1's corporate network but initiated alerts for when Device-1 attempted to connect.

e.     Company-1 identified attempts by Device-1 to connect to internal Company-1 IP addresses[2] from external IP addresses 174.195.151.28 (the "28 IP Address") on or

---

2     IP addresses are unique machine-readable numeric addresses that computers use to identify each other on the Internet. Every computer connected to the Internet must be assigned an

about September 21, 2020, and 174.195.143.186 (the "186 IP Address") on or about September 22, 2020. Company-1 provided data ("Dataset-1") associated with these September 21-22, 2020 attempts to law enforcement, including source IP addresses, destination IP addresses, timestamps, source port, destination port, protocol type, packets sent, bytes, and flags.

f.    In addition, on or about September 28, 2020, between on or about 18:46:42 UTC and on or about 19:12:12 UTC, Device-1, using the 186 IP Address, attempted unsuccessfully to connect directly with Company-1's corporate network.

g.    On the same date, a Company-1 employee ("Employee-2") was the target of a vishing attempt. Between on or about 19:37:34 UTC and on or about 19:51:23, Employee-2 received a call on Employee-2's Company-1 cellphone from phone number 512-798-3457, a number that had been used during previous vishing attempts against Company-1. The caller introduced himself as "IT support." The caller told Employee-2 that Employee-2's token had been compromised and needed to be re-synced. The caller then directed Employee-2 to a phishing website, which appeared to be a Company-1 login page. Employee-2, believing the website to be legitimate, entered Employee-2's login credentials and token information. The caller then had Employee-2 re-enter the information a second time. The caller advised Employee-2 that Employee-2's token was re-synced and the call ended.

h.    While on the phone with Employee-2, the Subject, using a particular electronic device other than Device-1 ("Device-2"), attempted to initiate a virtual private network

---

IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination.

6

("VPN") session to Company-1's corporate network via an anonymous VPN.[3] This connection was blocked.

      i.     Next, the Subject, using Device-1, successfully established a VPN connection to Company-1's corporate network using Employee-2's credentials. The Subject used the 186 IP Address—that is, the same IP address used during the earlier unsuccessful attempt to connect directly with Company-1's corporate network.

      j.     Once inside Company-1's network, the Subject used the credentials of multiple Company-1 employees to access and ultimately SIM swap[4] approximately three customers of Company-1.

      k.     Company-1 provided data ("Dataset-2") associated with the September 27-28, 2020 attempts to law enforcement, including source IP address, destination IP address, timestamps, source port, destination port, protocol type, packets sent, bytes, and flags.

      l.     During the relevant times, the 186 IP Address, which, as set forth above, was used on multiple occasions in attempts to access Company-1's network, was assigned to a particular telecommunications company other than Company-1 ("Company-2").

      m.     Dataset-1 and Dataset-2 from Company-1 were provided to Company-2, which analyzed the data.

---

3     Generally speaking, Internet service providers ("ISPs") assign IP addresses to their Internet customers. An individual may also connect to the Internet via a VPN, in which case the IP address assigned to the individual by the individual's ISP is masked. Based on my training and experience and involvement in this investigation, I know that individuals involved in social engineering and vishing campaigns sometimes use anonymous VPN IP addresses to hide their locations from law enforcement.

4     Generally, "SIM swapping" refers to a method of unauthorized takeover of a victim's wireless account by malicious actors, carried out by linking the victim's cellphone number to a subscriber identity module ("SIM") installed in a device controlled by the attacker(s).

7

n.      First, Company-2 analyzed Dataset-2. Company-2 identified approximately 150 customers of Company-2 who shared the 186 IP Address. Company-2 then determined that two of these customers navigated to the relevant Company-1 IP address during the relevant times. Company-2 then determined that only one of these two customers was assigned the 186 IP address at the specific time periods of interest. That customer's phone number was 760-336-6504 (the "6504 Number").

o.      Second, Company-2 performed a similar analysis of Dataset-1 and arrived at the same customer assigned the 6504 Number.

p.      During all relevant times, the 6504 Number was subscribed to the Subject at 205 West Ross Avenue, El Centro, CA 92243 (the "Subject Premises").[5]

13.      Subsequently the Investigation learned the following:

a.  In or around April 2020, the brother of the Subject (the "Brother") was the subject of a "swatting" attack, a criminal harassment tactic sometimes employed by malicious actors against other malicious actors in which a person places a false call to authorities that will trigger a police or special weapons and tactics ("SWAT") team response—thereby causing a life-threatening situation. In response to the false call, law enforcement responded to an apartment located at the Subject Premises and found at that location the Brother and his parents.

b.  A particular electronics retailer's ("Retailer-1") records reflected that Device-1 was purchased in or about August 2020 with cash at a particular retail location of Retailer-1 located in El Centro, California. At approximately the same time as the cash purchase of Device-1, another purchase from the same location of Retailer-1 was made by a customer who

---

5 The Government has not included the apartment number of the Subject Premises.

used a Retailer-1 rewards account in the name of the mother of the Subject (the "Subject's Mother"). The address associated with the rewards account was the Subject Premises.

c.    The records of the manufacturer of Device-1 ("Manufacturer-1") reflected that Device-1 was purchased in or about August 2020. The records listed two activation dates for Device-1: August 27, 2020 (two days before the Subject exploited a loophole in an internal Company-1 website to add Device-1 to the user profile of Employee-1) and September 28, 2020 (the date on which the Subject vished Employee-2). The September 28 activation was made from the 186 IP address.

14.    On or about November 18, 2025, United States Magistrate Judge Andrew G. Schopler, United States District Court, Southern District of California, issued a search warrant for the Subject Premises (the "Search Warrant").

**THE DEFENDANT-*IN-REM***

15.    On or about November 19, 2020, the Investigation executed the Search Warrant at the Subject Premises.

16.    During the execution of the Search Warrant, members of the Investigation interviewed the Subject and the Subject's Mother and the Subject voluntarily advised he had an Exodus account.

17.    Exodus is a platform that enable users to create digital cryptocurrency wallets, or link hardware cryptocurrency wallets, to "secure, manage, and swap cryptocurrency…"

18.    The Subject advised he had a significant amount of Bitcoin in his Exodus wallet. When asked how he obtained those funds, the Subject refused to disclose how he obtained such sums of cryptocurrency. Pursuant to the Search Warrant, members of the Investigation transferred    cryptocurrency    in    the    Subject's    Exodus    wallet    with    address

9

3PjqKPuquQXaCQEcSTrG1haMuCwtDNry99   (the   "Exodus   Wallet")   consisting   of approximately 21.73178086 BTC (the "Seized Crypto")[6] to a temporary holding address, created, controlled, and maintained by Homeland Security Investigations, New York for cryptocurrency seizures.

19.    Thereafter, the Investigation created a "paper wallet" to maintain the Seized Crypto (the "Paper Wallet"). Per Gemini, a publicly traded US based cryptocurrency exchange's website, "[A] paper wallet is a non-custodial cold storage wallet — meaning you control the keys yourself,     and     the     wallet     is     not     connected     to     the     internet." (https://www.gemini.com/cryptopedia/paper-wallet-crypto-cold-storage). The   wallet   is   not controlled by a third party, thus considered non-custodial. Nor is it accessible via online means (*e.g.*, web browser, third party platform/tool, etc.). This is done as a method of maintaining cryptocurrency securely, so a third-party entity cannot access the wallet.

20.    Third-party blockchain analysis verified the funds were successfully transferred from Exodus Wallet to HSI's temporary holding address and finally transferred to the Paper Wallet, where the Seized Crypto remains.

21.    After transferring the Seized Crypto to the Paper Wallet, the Investigation attempted to trace the source of the Seized Crypto seized from the Exodus Wallet. Open source blockchain analysis showed that the Subject had utilized methods to obfuscate the source of the funds like using a mixer, specifically, ChipMixer. Per the article *"What is a Bitcoin mixer?"* (https://www.coinbase.com/learn/your-crypto/what-is-a-bitcoin-mixer)   on   the   website   of Coinbase, a publicly traded US based cryptocurrency exchange, *"Bitcoin mixers, sometimes*

---

6 The amount is approximate because with every transfer of BTC, there are transaction fees, often referred to as "gas fees" or "miner fees".

*referred to as tumblers, are tools that aim to enhance transaction privacy by mixing Bitcoin transactions."* Further in the same article it states, *"[T]he ability to obfuscate Bitcoin transactions makes mixers a potential tool for illicit fund concealment, attracting individuals interested in hiding the proceeds of illegal activity."*

22.     Actors who use cryptocurrency will frequently use mixers as a method to obfuscate the tracing of cryptocurrency, serving as another form of money laundering. Due to the obfuscation of the transactions, and the Subject's refusal to disclose how he obtained those funds, the Investigation could not, at that time, identify the source of the funds.

23.     Separately, an unrelated investigation had been opened into the mixing service ChipMixer.

24.     Agents involved in the investigation of ChipMixer obtained a copy of the ChipMixer backend server during that investigation and were able to use that information to identify four peel chains going into the Exodus Wallet. Peel chains are an artifact of cryptocurrency transactions but services like mixers use the feature to obfuscate funds transfer. From the article "What Is a Peel Chain in Crypto Money Laundering?" published on the website of Merkle Science,[7] "[O]ne of the most common tactics used by bad actors to obscure the origins of stolen or illicit funds is a method known as a peel chain." (https://www.merklescience.com/blog/what-is-a-peel-chain-in-crypto-money-laundering).

25.     The four peel chains the Investigation identified were from three ChipMixer sessions. Demixing of the multiple transactions found the cryptocurrency had gone through

---

7 From their LinkedIn page, Merkle Science is a New York City based company that provides a platform for predictive cryptocurrency risk and intelligence, to help crypto companies, financial institutions, and government entities detect, investigate, and prevent illegal activities involving cryptocurrencies.

cryptoexchange services like ChangeNow.[8] Other peel chains were coming from transactions to Darknet marketplaces, fraud shops, other mixing services, and gambling sites.

26.     On or about October 27, 2025, the Investigation identified several large "payin_amount", that is, amounts where the customer paid into ChangeNow to convert cryptocurrency.     One     such     amount     was     from     the     address: rhCo7wrV8GoWtVZhqMfVa4NHd311jGokEk (the "okEk Address"). From using an open source blockchain analytical tool to trace the funds of the okEk Address, the Investigation learned approximately 20,789.98 XRP (Ripple) were sent from Coinbase to the okEk Address, and then from the okEk Address to ChangeNow. ChangeNow services were utilized to convert the XRP to BTC, resulting in a conversion of approximately 0.48058519999999999017 BTC.

27.     On or about October 31, 2025, the Investigation learned that the okEk address received funds stolen from a SIM swap account takeover of a victim's Coinbase account.

28.     The Investigation similarly traced funds in the Exodus wallet to an account at Gemini. As noted above, Gemini is a cryptocurrency exchange. On or about April 13, 2026, the Investigation learned that, on or about October 30, 2020, the holder of the relevant Gemini account reported unauthorized activity on the account and associated loss of funds to Gemini.

29.     Accordingly, the significant amount of Bitcoin within the Exodus wallet represents proceeds of the Scheme and is thus subject to forfeiture.

---

8 ChangeNow is a non-custodial cryptocurrency exchange service provider that offers instant cryptocurrency conversions (*e.g.*, BTC to ETH).

## III.  FIRST CLAIM FOR FORFEITURE

**Forfeiture Under 18 U.S.C. § 981(a)(1)(C)**
**(Property Constituting or Derived from Proceeds Traceable to a Violation of 18 U.S.C. § 1343 or 1349 Property Traceable to Such Property)**

30.    Paragraphs 1 through 29 of this Complaint are repeated and re-alleged as if fully set forth herein.

31.    Pursuant to Title 18, United States Code Section 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting "specified unlawful activity" as defined in section 1956(c)(7) of this title, or a conspiracy to commit such offense.

32.    As set forth above, for purposes of Section 1956, "specified unlawful activity" includes wire fraud, in violation of 18 U.S.C. § 1343.

33.    By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) as property constituting or derived from proceeds traceable to a violation of Title 18, United States Code, Section 1343, and as property involved in money laundering transactions, in violation of Title 18, United States Code, Section 1956.

## IV. SECOND CLAIM FOR FORFEITURE

**Forfeiture Under 18 U.S.C. § 981(a)(1)(A)**
**(Property Involved in Money Laundering)**

34.    Paragraphs 1 through 29 of this Complaint are repeated and re-alleged as if fully set forth herein.

13

35.    Title 18, United States Code, Section 981(a)(1)(A) subjects to forfeiture "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

36.    Title 18, United States Code, Section 1956(a)(1)(B)(i) imposes criminal penalties on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

37.    Under Title 18, United States Code, 1956(c)(7)(A), "specified unlawful activity," includes, among other things, "any act or activity constituting an offense listed in section 1961(1) of this title." Section 1961(1) lists, among other things, wire fraud (Section 1343). In addition, Title 18, United States Code, Section 1349 provides:

> Any person who attempts or conspires to commit any offense under this chapter [including wire fraud] shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

38.    By reason of the foregoing the Defendant-*in-rem* is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(A) as property involved in money laundering, in violation of Title 18, United States Code, 1956.

14

WHEREFORE, plaintiff United States of America prays that process issue to enforce the forfeiture of the Defendant-*in-rem* and that all persons having an interest in the Defendant-*in-rem* be cited to appear and show cause why the forfeiture should not be decreed, and that this Court decree forfeiture of the Defendant-*in-rem* to the United States of America for disposition according to law, and that this Court grant plaintiff such further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: New York, New York
      May 26, 2026

JAY CLAYTON
United States Attorney for the
Southern District of New York
Attorney for the Plaintiff
United States of America

By: _____
Timothy Capozzi
Juliana Murray
Assistant United States Attorneys
26 Federal Plaza
New York, New York 10278
(212) 637-2404/2314

15

## VERIFICATION

STATE OF NEW YORK              )
COUNTY OF NEW YORK             :
SOUTHERN DISTRICT OF NEW YORK  )

Chae Im, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Federal Bureau of Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

Executed on May 14, 2026

_____
Chae Im
Special Agent
Federal Bureau of Investigation

16